THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


LEANNE M. FREEMAN                                                    PLAINTIFF

            v.                              Civil No. 13-2251

CAROLYN W. COLVIN,[1] Commissioner
Social Security Administration                                      DEFENDANT


MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION


Plaintiff, Leanne M. Freeman, brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's decision to terminate her entitlement to disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

I.      **Procedural Background**

Plaintiff was found disabled on July 1, 2006 in a determination of the same date. (Tr. 55.) The most recent favorable decision or comparison point decision("CPD") was dated February 1, 2007. In this decision her impairments of Multiple Sclerosis (3400) ("MS") and Anxiety (3000) were found to medically equal Listing 11.09 (MS) and 12.06 (Anxiety Disorders). (Tr. 57.) Her RFC was less found to be less than sedentary due to MS. (Tr. 116.) She was also assigned an unskilled mental RFC due to somatoform disorder, adjustment disorder, and passive/dependent personality traits. (Tr. 116.)

On April 1, 2011, the Commissioner found that Plaintiff had shown medical improvement and she was ruled able to work. (Tr. 122.) The report stated that Plaintiff's physical exam was "now within

---

[1]Carolyn W. Colvin became the Social Security Commissioner on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin has been substituted for Commissioner Michael J. Astrue as the defendant in this suit.

AO72A
(Rev. 8/82)

normal limits and no neurological deficits were noted. She does continue to have some depressive symptoms and a current mental status exam shows a diagnosis of dysthymia, somatoform pain disorder, and dependent traits." (Tr. 116.) Benefits were therefore to terminate on June 2011. (Tr. 116.) Plaintiff requested that benefits be continued pending final determination, which was permitted. (Tr. 77.)

Plaintiff's request for reconsideration was denied in a hearing officer's report dated November 11, 2011. (Tr. 164.) Plaintiff requested an administrative hearing, which was held on April 17, 2012 in front of Administrative Law Judge ("ALJ") Edward Starr. (Tr. 74.)  Plaintiff was present to testify and was represented by counsel. The ALJ also heard testimony from Plaintiff's daughter, Britney Street, and Vocational Expert ("VE") Dr. Larry Seifert. (Tr. 74.)

At the time of the administrative hearing, Plaintiff was 40 years old, and confirmed that she had a high school education. (Tr. 77-72.) Other documents in the record indicates that she also has an associate's degree. (Tr. 159, 470.) The Plaintiff had past relevant work experience ("PRW") of cashier and stocker at Wal-Mart. (Tr. 65.)

On August 10, 2012, the ALJ concluded that Plaintiff had the following medically determinable impairments: Fibromyalgia (7290) and mood disorders. The ALJ further found that she had been diagnosed with diabetes mellitus (2500), obesity (2780), and chronic pain syndrome (somatoform disorder) (3060). None of these were found to meet the requirements of the impairment listings. (Tr. 57.) He also found that the claimant had alleged that laboratory testing shows that she has lupus (7140), but that "the medical evidence does not confirm that diagnosis." (Tr. 57.)

Of these impairments, the ALJ found Plaintiff's mood disorder and somatoform disorder to be severe in section 5 of his order. (Tr. 58.) He also stated at section 8 of his decision that "[b]eginning on April 1, 2011, the claimant's impairments have continued to be severe."

The ALJ found that Plaintiff maintained the physical residual functional capacity to perform sedentary work except as follows:

2

> The claimant can understand, remember, and carry out simple, routine, repetitive task~. She can respond to usual work situations and routine work changes. She can respond to supervision that is simple, concrete, and direct. She can occasionally interact with coworker and the public. She can occasionally lift/carry ten pounds and frequently less. She can sit for six hours in a day, and stand/walk for two hours in a day. She can frequently finger and handle. She can occasionally climb, balance, crawl, kneel, stoop, or crawl. She must avoid temperature extremes.

(Tr. 60.) The ALJ heard testimony from VE Dr. Seifert at the hearing. He also sought interrogatories from VE Tanya Owens on June 12, 2012.  (Tr. 66.) He found that Plaintiff could perform the requirements of representative occupations such as Driver, DOT#919.663-022. (Tr. 66.)

Plaintiff requested a review by the Appeals Council. (Tr. 9.)  The Appeals Council declined review on September 30, 2013. (Tr. 1.) Both parties have filed appeal briefs, and the case is now ready for decision. (ECF Nos. 9, 10. )

## II.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).  Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Id*.  "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision."  *Id.*  As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  If the court finds it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, the court must affirm the decision of the Secretary."  *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

After a claimant begins receiving benefits, the Commissioner is required by both statute and regulation to review the case periodically to determine if continuation of benefits is appropriate. 42 USCA

AO72A
(Rev. 8/82)

§ 423(f); 20 CFR § 404.1594(a). If the Commissioner finds that there has been medical improvement in the claimant's impairment or combination of impairments, and if that improvement enables the claimant to perform substantial gainful activity, then benefits will be terminated. *Id.*

"To discontinue a claimant's benefits because his or her medical condition has improved, the Commissioner must 'demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work.'" *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001)(quoting *Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir.1991)); *see also* 20 C.F.R. § 404.1594(b)(2)-(5)). "Whether a claimant's condition has improved is primarily a question for the trier of fact, generally determined by assessing witnesses' credibility." *Muncy*, 247 F. 3d at 734.

This "medical improvement" standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits. The continuing disability review process involves a sequential analysis prescribed in 20 C.F.R. § 404.1594(f). *See Dixon v. Barnhart*, 324 F.3d 997, 1000-1001 (8th Cir. 2003). The regulations provide that determining whether a claimant's disability has ceased may involve up to eight steps in which the Commissioner must determine the following: 1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been a medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8)

4

if the claimant is unable to do work performed in the past, whether the claimant can perform other work. *See id.* (citing 20 C.F.R. § 404.1594(f)).

This sequential analysis for cessation of benefits includes the five steps to be followed in an initial disability determination. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993) (the five-step process for making the initial disability evaluation is: (1) whether claimant is engaged in substantial gainful activity, (2) whether claimant has a severe impairment, (3) whether the impairment meets or equals the severity of a listed impairment, (4) whether claimant has the residual functional capacity to perform past relevant work activity, and (5) if claimant is unable to do past work, whether claimant can perform other work).

For both initial claims and continuing entitlement review cases, the Plaintiff bears the "'continuing burden' to demonstrate that he is disabled." *Nelson*, 946 F.2d at 1315 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 336(1976)). However, [o]nce the claimant meets this initial responsibility . . . the burden shifts to the Secretary to demonstrate that the claimant is not disabled." *Nelson*, 946 F.2d at 1315.

## III.   Discussion

Plaintiff raises three issues on appeal: 1) the ALJ erred as to Plaintiff's RFC; 2) the ALJ erred in his credibility analysis; and 3) the ALJ failed to fully develop the record as to Plaintiff's Lupus and Fibromyalgia. (Pl.'s Br. at 10, 14, 17.)

Because the Plaintiff has a lengthy medical record, her medical records since 2007 have been summarized prior to addressing these arguments.

Plaintiff was originally found to be disabled as of July 1, 2006, largely due to an MS diagnosis. (Tr ) She underwent several consultative examinations in 2007 for a comparison point decision ("CPD"). (Tr. 57.)  Dr. C.R. Magness diagnosed her with multiple sclerosis, fibromyalgia, hypertension / [illegible], tobacco use, and obesity on November 16, 2007. (Tr. 370.) She was seen by orthopedic specialist Dr. Thomson on January 4, 2007. He noted major neurological abnormalities that were "rather generalized."

5

He noted gait disturbance and that there was some nodding of head and arms. (Tr. 372.) She was seen by Dr. Cygnet Schroeder of HealthSouth Rehab on January 16, 2007. Dr. Schroeder noted gait abnormalities, that she "certainly could have multiple sclerosis with her symptomology presenting this way. There are no records available to see if she has had diagnostic testing that would include ruling out systemic lupus"; Dr. Schroeder also noted elements of depression and that she was limited by pain and fatigue. (Tr. 380.) Plaintiff's comparison point decision on February 2007 indicated that she had MS and anxiety. Benefits were confirmed. [2] (Tr. 57.)

Plaintiff was referred to Sparks Cardiology Center by Dr. Deaton of Alma Clinic in April 2008, (Tr. 549.) She had complained of a burning sensation in the chest. Results indicated no evidence of perfusion or ischemic, and normal left ventricular wall motion. No further cardiac studies were considered necessary. (Tr. 549.)

Treatment notes from Cornerstone Clinic for 2009 and 2010 indicate diagnoses of hypertension, diabetes mellitus, fibromyalgia, lower back pain, leg numbness (possibly neuropathy from diabetes), tachycardia, chest pain, urinary tract infection, increased liver function/liver enzyme tests, and a sprained shoulder. (Tr. 394-417.) At each appointment patient was counseled about diet, obesity, smoking, and blood sugar monitoring. Plaintiff was prescribed a variety of medications for her diagnoses.

Treatment notes from two visits to Alma Family Medical Clinic, one in 2009 one in 2010 indicate diagnoses complaints of numb feet with musculoskeletal pain. Diagnoses were chronic pain syndrome, fibromyalgia, Type 2 diabetes, tachycardia, hypertension, and high cholesterol . (Tr. 426-28.) On October 26, 2009, Plaintiff saw Dr. Mankin for a cholesterol followup. She admitted that she had not been taking her cholesterol medicine and was trying to take care of her cholesterol via exercise and diet.(Tr. 428.) On June 29, 2010 Dr. Margaret Mankin noted that Plaintiff was returning to see her after seeing Dr. Rana, also

---

[2]The actual CPD does not appear to be in the record before this Court. Thus it was necessary to rely on the notations of the ALJ in this case as to the findings of that continuing entitlement review.

AO72A
(Rev. 8/82)

of Cornerstone. She noted that Plaintiff was "very tearful about her fibromyalgia and states that she has an occasional pain." Dr. Mankin noted that Plaintiff was not working out or doing any stretching exercises. She noted that Dr. Rana had sent her to physical therapy but she had not gone. Plaintiff admitted that she was not watching what she was eating and was not taking care of her diabetes. (Tr. 426.) Dr. Mankin was not able to "reproduce any of the pain." (Tr. 426.)

Dr. Rana of Cornerstone Clinic referred Plaintiff to Orthopedic and Pain Management Specialist Dr. Qureshi of Arkansas Spine and Pain, and Clinical Assistant Professor at UAMS. She was seen by Dr. Qureshi on on December 23, 2009. (Tr. 437-39.) Dr. Qureshi diagnosed her with chronic pain syndrome, fibromyalgia, lumbar degenerative disc disease, and lumbar spondylosis. (Tr. 439.) He gave her a back brace, some medical prescriptions, and ordered physical therapy and additional tests. She was counseled on medication side effects, smoking cessation, weight control, and a home-exercise program. She was to be seen again in several weeks, but there are no additional treatment notes from him. (Tr. 439.)

Plaintiff was seen for a CE by orthopedic specialist Dr. Ted Honghiran on December 29, 2010. (Tr. 453-56.) Dr. Honghiran noted minimal degenerative disk disease at L4-5 and L5-S1. He noted the history of multiple sclerosis since 1991 but was not able to confirm it. He believed "her main problem would be multiple sclerosis that has been diagnosed by a neurologist at one time." (Tr. 454.) He noted no signs of neurological deficits in his exam. (Tr. 454.)

Treatment notes from Cornerstone Clinic in 2011 indicate fibromyalgia, diabetes mellitus, vaginal discharge, complaints of intermittent double vision, urinary tract infection, hypertension, lower back pain, and increased liver function tests. (Tr. 493-503.) At each appointment patient was counseled about diet, obesity, smoking, and blood sugar monitoring. She was referred to Dr. Birky for the double vision. (Tr. 500.)

Plaintiff was seen at Sparks Stanley E. Evans Heart Institute on August 16, 2011, after complaining of chest pain and tachycardia. She underwent a two-dimensional electrocardiogram/doppler

AO72A
(Rev. 8/82)

on August 17, 2011. (Tr. 553.) The summary indicated normal systolic function, although there was some question as to the quality of the study due to "poor subcostal windows." (Tr. 552.) The notes indicated that "she drinks a lot of coke." Part of her treatment plan was to stop smoking, "eliminate her coke" and "try to lose at least 20 lbs in the next 6 months. She will start regular exercise 30 min/daily." (Tr. 557.) Several of her drugs were also discontinued. (Tr. 557.)

Plaintiff presented to Dr. Duane Birky of Sparks Neurology Center on September 15, 2011. She complained of double vision, and was in the Crawford County ER the prior Friday with a flare-up and slurred speech. (Tr. 535.) She complained of bilateral facial numbness, edema, facial droop, and numbness in fingers and toes starting June 9, 2011. She had a sunburn-like symptom on face and arms. Dr. Birky noted that she "had a fairly extensive workup in the past including brain MRI but nothing was found." (Tr. 535.) On exam he noted a normal gait, but could see a slight tremor in legs at times. (Tr. 582.) Birky noted that he "cannot completely r/o CVA or MS. also has arthritic component. need to r/o lupus or other." (Tr. 5390.) Later comments in the record for the same day state the following: "Brain MRI normal. Lab tests show diabetes runs high. Lupus test was positive. Test for a virus called CMV[3] also elevated, suggesting past infection." (Tr. 546.) He noted that she reported drinking more than thirty-two ounces of caffeinated soda per day. (Tr. 579.) Treatment notes from Crawford County gave a clinical impression of : Bell's Palsy,[4] Essential Hypertension, NIDDM (Non-Insulin Dependent Diabetes Mellitus), and Acute Hyperglycemia. (Tr. 570.)

---

[3]CMV is cytomegalovirus. Cytomegalovirus (CMV) can cause infections that have a wide range of severity. A syndrome that is similar to infectious mononucleosis but lacks severe pharyngitis is common. Sixty to 90% of adults have had CMV infection.
http://www.merckmanuals.com/professional/infectious_diseases/herpesviruses/cytomegalovirus_cmv_infection.html?qt=CMV&alt=sh

[4]Also known as idiopathic facial nerve palsy. The mechanism for idiopathic facial nerve palsy is presumably swelling of the facial nerve due to an immune or viral disorder. Recent evidence suggests that herpes simplex virus infection is the most common cause and that herpes zoster may be the second most common viral cause.
http://www.merckmanuals.com/professional/neurologic_disorders/neuro-ophthalmologic_and_cranial_nerve_disorders/facial_nerve_palsy.html?qt=bell%27s%20palsy&alt=sh

AO72A
(Rev. 8/82)

Plaintiff saw Dr. Birky again on February 2, 2012. She reported no further diplopia or facial weakness but had joint pain and swelling every day and the bottoms of her feet hurt when she walked on them. She had not yet seen a rheumatologist about her possible lupus. (Tr. 592.) At this exam she was negative for "dizziness, extremity weakness, gait disturbance, headache, memory impairment, numbness in extremities."(Tr. 592.)

A letter from Dr. James Deneke of Cooper Clinic Department of Rheumatology dated February 29, 2012 indicated that Plaintiff's tests for Lupus and Sjogren's Syndrome were negative. It stated that her tests "do not argue for the presence of systemic lupus erythematosus or other connective tissue disease. I would be reassured that there is no obvious inflammatory condition present at this point." (Tr. 597.) Her blood sugar was elevated at 181. (Tr. 597.)

Plaintiff was seen for a followup visit at Arkansas Pain and Wellness on March 1, 2012. (Tr. 603.) She reported pain, and intermittent weakness in her legs. She was not able to tolerate the gabapentin they had prescribed for her pain. (Tr. 603.) No diagnoses were listed for the exam, however, Dr. Sewell noted that "not all symptoms of fibromyalgia are present." (Tr. 604.) He also noted that "Physical examination of the patient's back indicates trigger points on palpatation produces severe pain. There is significant out of proportion to the elicited stimuli."(Tr. 604.)  They increased her Tramadol and Nortiptyline dosages. (Tr. 604.)

The next treatment notes are from Cornerstone Clinic for the dates February 15 and March 15, 2012 . (Tr. 622-25.) The assessments for these notes include "s. weakness and fibromyalgia," lower back pain, hypertension, diabetes mellitus, "CP" (cardiac performance or cardiac pace), depression, GERD (Gastric Esophageal Reflux Disease) and GAD (Generalized Anxiety Disorder). (Tr. 622-25.) At each appointment Plaintiff was counseled about diet, obesity, smoking, and blood sugar monitoring.

Plaintiff submitted additional records from Cornerstone Clinic after the hearing for June 18, 2012. The assessment found GAD, ingrown toenail, gastritis, and hypertension. (Tr. 628.) Additional records

9

from Cornerstone Clinic dating March, May, June and July 2012 included assessments of fibromyalgia, GAD, palpitations, diabetes mellitus, diplopia (double vision), vaginal discharge, lower back pain, hypertension, CP, PVD, and depression. At each visit Plaintiff was counseled about diet, obesity, smoking, and blood sugar monitoring.

Plaintiff also submitted a mental CE with Dr. Patricia Walz on March 23, 2011 for this continuing review. (Tr. 469.) She diagnosed the following:

Axis I:  Dysthmia, Somatoform Pain Disorder

Axis II: Dependent Traits

Axis V: 40-50

(Tr. 472.) The record does not indicate that Plaintiff sees a treating mental health professional. In her discussion with Dr. Walz, she reported drinking "at least four caffeinated cokes per day," and smoking a half pack of cigarettes per day. (Tr. 471.)

A Psychiatric Review Technique form was completed by non-examining Agency physician indicated Dr. Brad Williams on March 31, 2011. This form indicated no medical improvement. (Tr. 475, 487.)

A Physical RFC form was completed by non-examining Agency physician Dr. Jerry Thomas on July 15, 2011. (Tr. 516-23.) He found that medical improvement had occurred and  assessed a light RFC with no additional limitations. (Tr. 516-23.) He noted that her ADL's "were not realistic." (Tr. 523. )

### A.    Credibility Analysis

Plaintiff argues that the ALJ did not give any substantiated reasons for discrediting Plaintiff's credibility. Plainitff  further argues that the ALJ's references to her weight in his credibility analysis was error because no physician had stated that Plaintiff's weight "had anything at all to do with her multiple medical conditions." (Pl.'s Br. at 15-16.)

10

"Whether a claimant's condition has improved is primarily a question for the trier of fact, generally determined by assessing witnesses' credibility." *Muncy*, 247 F. 3d at 734. In order to assess credibility, the ALJ must consider several factors when evaluating a claimant's subjective complaints of pain, including claimant's prior work record, observations by third parties, and observations of treating and examining physicians relating to 1) the claimant's daily activities; 2) the duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Casey*, 503 F.3d 687, 695 (8th Cir.2007) (citing *Polaski v. Heckler*, 729 F.2d 1320, 1322 (8th Cir.1984). In discrediting a claimant's subjective complaints, an ALJ is required to consider all available evidence on the record as a whole and is required to make an express credibility determination. *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). However, the ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir.2004). An ALJ's decision to discredit a claimant's credibility is entitled to deference when the ALJ provides "good reason for doing so." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001.)

In this case the ALJ has noted two good reasons for discrediting Plaintiff's credibility, therefore his decision is entitled to deference.

First, as the ALJ noted, Plaintiff seriously damaged her credibility by refusing to follow consistently repeated advice from numerous physicians to attend physical therapy, to exercise, to manage her diet in order to help control her diabetes, fibromyalgia, and high cholesterol, to lose weight, to stop smoking, and to eliminate caffeine for her tachycardia. It is well-settled in the Eighth Circuit that "[a] failure to follow a recommended course of treatment . . . weighs against a claimant's credibility." *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005); *see also Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) ("Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.")

11

The failure to attend physical therapy is particularly damaging in this case, given that Plaintiff was prescribed physical therapy by both Dr. Rana (general practitioner) and Dr. Qureshi (pain management and orthopedic rehabilitation specialist). (Tr. 426, 669.) Dr. Mankin (general practitioner), to whom Plaintiff presented as being "very tearful about her fibromyalgia," also strongly counseled Plaintiff that "the treatment for fibromyalgia is exercise and physical therapy." (Tr. 426-27.) However, there is no indication in the record that Plaintiff has ever attended even a single session of physical therapy.

This Court also notes that Plaintiff has admitted to deciding to stop taking medications as prescribed without first consulting a physician. She has also failed to seek  mental health treatment, despite the fact that both her initial and continuing evaluation assessments indicated a mental health component to her impairments.

Second, the ALJ also noted that some of Plaintiff's objective medical records were inconsistent with Plaintiff's complaints of pain. While the ALJ may not rely solely on this inconsistency, it may properly be considered as one factor in the credibility analysis. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004)

Plaintiff's arguments concerning the ALJ's reference to her weight are without merit.  Plaintiff was consistently told by treating physicians to lose weight. Further, SSR 02-1p explicitly recognizes that obesity can cause or exacerbate both physical and mental health impairments, including many of the impairments alleged by Plaintiff.

**B.      Development of Record**

Plaintiff also argues that the ALJ neglected to fully develop the record regarding Plaintiff's fibromyalgia and potential lupus when he failed to send her to a consultative specialist in Rheumatology.

The ALJ has a duty to fully and fairly develop the record. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995)(ALJ must fully and fairly develop the record so that a just determination of disability may be made). This duty exists  "even if ... the claimant is represented by counsel." *Boyd v. Sullivan*, 960 F.2d

AO72A
(Rev. 8/82)

733, 736 (8th Cir.1992) (quoting *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir.1983)). Once the ALJ is made aware of a crucial issue that might change the outcome of a case, the ALJ must conduct further inquiry to fully develop the record. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004.); *see  e.g. Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir. 2010) (ALJ's failure to recontact Commissioner's consultative physician to authenticate his report was reversible error when that report supported Plaintiff's claim).

Plaintiff's treating neurologist Dr. Birky did indicate that her Lupus test was positive on September 15, 2011. However, her treating rheumatologist stated that she did not have Lupus or any other inflammatory condition on February 13, 2012. The ALJ's decision to credit the diagnosis of a treating rheumatologist over that of a treating neurologist concerning an autoimmune rheumatic disorder was not error. *See Brown v. Astrue,* 611 F.3d 941, 953 (8th Cir. 2010) (a treating specialist's opinion is entitled to the highest deference by the ALJ as long as the opinion concerns his or her speciality and is not seriously flawed in some way.)

The ALJ did err in failing to have a treating or examining physician complete an RFC assessment for her fibromyalgia on the current entitlement  review. However, it appears that it was a harmless error for three reasons. First, as discussed above, Plaintiff failed to follow the recommended treatment for her fibromyalgia, thus raising serious credibility concerns for this condition. Second,  as discussed below, the ALJ gave Plaintiff considerable benefit of the doubt in assigning her overall RFC. Third, despite running multiple tests, Plaintiff's own treating rheumatologist was not able to find that Plaintiff suffered from any inflammatory condition or connective tissue disease. Therefore, it does not appear that an RFC assessment from a rheumatologist would have been likely to produce a different result in this case. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, [the Plaintiff] must provide some indication that the ALJ would have decided differently if the error had not occurred."); *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995)( "reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial").

13

### C.  Overall RFC Assessment

RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009)*; see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (ALJ is responsible for determining RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of his limitations).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003); *see also Jones*, 619 F.3d at 971 (RFC finding must be supported by some medical evidence).  "Under this step, the ALJ is required to set forth specifically a claimant's limitations and to determine how those limitations affect her RFC." *Id.* The issue is not the existence of pain, but instead whether the Plaintiff's experience of pain precludes substantial gainful activity. *See Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991).

In this case, the ALJ thoroughly and accurately discussed Plaintiff's medical records from numerous treating and consultative general practitioners and specialists in coming to his assessment. The non-examining Agency physician assessed a physical RFC of light work with no exertional limitations. Despite this, and despite Plaintiff's lack of credibility, the ALJ gave her considerable benefit of the doubt in assessing an RFC of sedentary exertion with additional limitations. *See. e.g. Ellis v. Barnhart*, 392 F.3d

14

988, 993 (despite Plaintiff's lack of credibility, ALJ gave claimant benefit of the doubt in assessing RFC of sedentary work).

**IV.      Conclusion**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and thus recommends that the decision be affirmed, and Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 4th day of September 2014.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

15